A03A0704. IN RE ESTATE OF SIMS.
(578 SE2d 498)

ELDRIDGE, Judge.

John Randolph Cherry, the Executor of the Estate of Rebecca Wight Cherry Sims, upon his mother's death was substituted as defendant in the action for specific performance and damages brought by Coast House, Ltd./Sandease, Ltd. ("Joint Venture") against her. On March 1, 1991, the Joint Venture obtained a judgment of $3,800,000 against the Estate. This gave the Estate a legal malpractice action against Moreton Rolleston, Jr., whose conduct caused the damages to the Joint Venture while he represented Sims. On September 17, 1991, in settlement and satisfaction of the judgment, the Estate and the Joint Venture entered into a letter settlement agreement and promissory note, which transferred certain Estate assets, both real and intangible, to the Joint Venture to partially satisfy the note and pledged sufficient net proceeds from any malpractice action recovery to pay the principal and interest on the balance of the note; any balance of the net proceeds after satisfaction of the note was to be retained by the Estate. The letter settlement agreement permitted the Estate to retain and distribute to the heirs, the four Cherry sons, two properties in Cherokee County, the interest in the Wight Family Partnership, tangible personal property of the mother, and the limited liquid assets of the deceased. On April 7, 1995, the Estate obtained a judgment against Rolleston for $5,200,000; however, after a number of appeals and actions for fraudulent conveyance, it took until January 1998 for receipt of the first recovery, i.e., $1,125,500 paid by the errors and omissions carrier St. Paul Insurance Company, and until 2000 for receipt of the second and third recoveries through collection actions. The settlement agreement and note when construed together are ambiguous as to whether the Executor received his commission on any recovery before the net proceeds or whether he waived his commission on any net proceeds and whether the proceeds of the malpractice action were assigned only as security for payment of the note or as a general assignment giving the Joint Venture all right, title, and interest in all the net proceeds.

The Executor sought an order approving an interim payment of his statutory Executor's Commission, covering nine legal actions in three counties, federal bankruptcy court, and countless appeals and moved for summary judgment; the Joint Venture filed a cross-motion for summary judgment. On August 9, 2002, in a final order, the Probate Court of Fulton County held that the Estate had assigned the net proceeds of the litigation to the Joint Venture and that the Executor had waived his statutory commission. Finding legal error as to each legal determination, we reverse.

1. The Estate contends that the probate court erred, because the Executor's commissions are a priority administrative expense entitled to payment prior to a secured creditor's claims to "net proceeds" of sums recovered by the Estate on the legal malpractice action against Rolleston. We agree.

Under OCGA § 53-7-40 (3), "[o]ther necessary expenses of administration" take priority over "all other claims." The judgment obtained by the Joint Venture against the Estate and any security interest it obtained from the Estate placed such claims lower in priority than claims for commissions as an expense of the administration of the Estate. *Benfield v. McMillan*, 188 Ga. 52, 53 (2 SE2d 600) (1939). An executor has no power to assign property of the estate to a lower claim in derogation of claims of higher priority. OCGA § 53-7-40; *Professional Discount Corp. v. Fulton Nat. Bank of Atlanta*, 223 Ga. 424, 426 (1) (156 SE2d 80) (1967); *King v. Dalton*, 85 Ga. App. 641, 643-644 (69 SE2d 907) (1952).

Under OCGA § 53-6-60 (b), the Executor's commission was 2.5 percent of all funds received by the Estate and 2.5 percent of all funds paid out of the Estate. Such commission on the amounts flowing through the Estate were the Executor's as a matter of statutory right. See *Gaines v. Johnson*, 216 Ga. 668, 670 (2) (119 SE2d 28) (1961) (the executor and guardian is entitled to the commission in both capacities although it is the same funds); *Colyer v. Huntley*, 179 Ga. 332, 334 (175 SE 901) (1934) (land can be sold to pay the executor's commission, because it is a necessary expense of the administration of the estate); *Sams v. Leskanic*, 220 Ga. App. 202, 203 (469 SE2d 703) (1996).

Now, the Georgia public policy is that under OCGA § 53-6-60 (g), an executor may waive and renounce all or part of his commissions; however, the statute sets forth no method regarding how a waiver may be made by an executor. Further, Ga. L. 1996, p. 504, § 10, as amended by Ga. L. 1997, p. 1352, § 1, does not apply to estates prior to the effective date of January 1, 1998, where a right has already become vested, as in the case of the statutory right to an executor's commission. A mere statement that the executor's commissions are waived is not sufficient to waive the statutory right; to bind the exec-

utor to a waiver of his rights to a commission, there must be a binding contract with consideration. *Jones v. Jones*, 141 Ga. 727, 729 (4), 730 (7) (82 SE 451) (1914).

Since the Estate sought to settle its debt to the Joint Venture, then the heirs in their individual capacity may benefit by preserving some of their inheritance by the settlement and can agree to such settlement; but, Cherry, with his separate rights to commissions, arising from the performance of his duties as Executor, would have to separately act to expressly waive any rights to his commission. Thus, the letter settlement agreement and the promissory note must be construed together to determine whether or not the Executor waived his individual rights to commissions on the recoveries against Rolleston, if and when obtained. *Interstate Fire Ins. Co. v. Nat. Indem. Co.*, 157 Ga. App. 516, 518 (277 SE2d 802) (1981) (construe together instruments that are intended to be part of the same transaction). Therefore, the issues of waiver of the right to commissions and to assignment of the net proceeds of any recovery on the legal malpractice action are matters of contract construction as a legal matter by the court, if they are ambiguous. *Archer v. Carson*, 213 Ga. App. 161, 163 (1) (444 SE2d 82) (1994); *Cassville-White Assoc. v. Bartow Assoc.*, 150 Ga. App. 561, 564 (3) (258 SE2d 175) (1979).

A contract between parties may arise from more than one document when such documents are intended by the parties to be construed together to disclose the intent of the parties. *Cassville-White Assoc. v. Bartow Assoc.*, supra at 564 (3). In this case, the Estate and the Joint Venture entered into a letter settlement agreement and a promissory note, which were intended to comprise their agreement. See *Weinstein v. Schacter Bros.*, 32 Ga. App. 742 (1) (124 SE 803) (1924). Where a contract is clear and unambiguous, the trial court must enforce the agreement as written from its terms without any construction by the trial court, even though the parties disagree upon its meaning. See *Paul v. Paul*, 235 Ga. 382, 384 (219 SE2d 736) (1975); *Bold Corp. v. Nat. Union Fire Ins. Co.*, 216 Ga. App. 382, 384 (1) (454 SE2d 582) (1995). However, where the contract is ambiguous in its terms, then the trial court must apply the rules of construction to determine the intent of the parties as a matter of law prior to any jury determination. See *Crooks v. Crim*, 159 Ga. App. 745 (285 SE2d 84) (1981); *Andrews v. Skinner*, 158 Ga. App. 229 (279 SE2d 523) (1981).

The August 22, 1991 letter settlement agreement provided in pertinent part that:

(6) The Estate will execute an unsecured note bearing interest at the legal rate of 12% per annum to my clients [(the Joint Venture)] in the amount of the judgment, includ-

ing accrued interest, less any payments and/or less the agreed upon appraised value of the property at 1777 West Paces Ferry.

(7) Your client [(the Estate)] will hire the attorneys designated by the Plaintiffs [(the Joint Venture)] to pursue a claim for legal malpractice and/or contribution against Mr. Moreton Rolleston, Jr. on behalf of the Estate. My clients [(the Joint Venture)] will agree to pay any and all necessary expenses involved in said litigation to be pursued on the basis of a contingent fee not to exceed thirty percent. The net recovery of said claim will be payable upon receipt toward the note referred to in paragraph 7 above, with any remainder after full payment of the note to be paid to the Estate. This litigation is to be commenced as soon as practicable.

This letter settlement agreement was executed by counsel for each of the parties on their behalf and was prepared by counsel for the Joint Venture; there never was a subsequent written settlement agreement executed by the parties themselves, because the promissory note only refers to the letter agreement of August 22, 1991. The letter settlement agreement stated that the note given in settlement was unsecured; however, the promissory note states that the net proceeds of any recovery were assigned as security to the Joint Venture. Thus, the ordinary meaning of "unsecured," i.e., no security interest that can be effective against third parties under the UCC,[1] should be applied, leaving the assignment as security of the net proceeds as a contractual obligation between the parties. *Stinchcomb v. Clayton County Water Auth.*, 177 Ga. App. 558 (340 SE2d 217) (1986) (ordinary meaning given to words except when a valid reason given for other meaning).

John Randolph Cherry in his capacity as Executor of the Estate of Rebecca Wight Cherry Sims and not in his individual capacity executed the promissory note to the Joint Venture in settlement of its judgment against the Estate. However, the note contained conflicting language with the letter settlement agreement, further making it ambiguous: "[t]o secure the payment of this note, the maker hereby conveys and assigns to [the] holder, pursuant to the terms and conditions of that certain letter agreement dated August 22, 1991 between

---

[1] OCGA § 11-9-109 (d) (9) states that "[a]n assignment of a right represented by a judgment, other than a judgment taken on a right to payment that was collateral" and (12) "[a]n assignment of a claim arising in tort, other than a commercial tort claim, but Code Sections 11-9-315 and 11-9-322[, neither of which were complied with to perfect,] apply . . . to proceeds and priorities in proceeds" and do not come under the UCC coverage as a secured transaction.

the parties acting through their attorneys, the following property." The letter settlement agreement stated that the balance of the net proceeds after the satisfaction of the note would be paid by counsel to the Estate, creating yet another ambiguity whether the assignment was a general assignment of the net proceeds as now contended by the Joint Venture or a limited assignment for security only. The promissory note contained further language that stated

> [t]he net proceeds after deduction of Attorneys Fees and Expenses recovered on any and all claims, settlements, or judgments based upon contribution, negligence, or any other legal theory against Moreton Rolleston, Jr., his heirs and assigns, or any other person, corporation, or other entity, arising as a consequence of advice rendered by Moreton Rolleston, Jr. for Mrs. Rebecca Wight Cherry Sims.

However, paragraph (7) of the settlement agreement stated that the Joint Venture would pay any and all expenses of litigation, which further created ambiguity with the letter settlement agreement as to what such expenses were. The letter settlement agreement defined expenses as arising from litigation with Rolleston, but the promissory note refers to expenses generally without qualification, which include the expense of the Estate in collecting the assets, i.e., commissions, in the context of the duties of the Estate.

When more than one reasonable construction may be placed upon the language of an agreement or when the language in the agreement is in conflict, ambiguity exists, requiring the trial court to construe the contract to determine the intent of the parties as a matter of law to resolve any ambiguity. OCGA § 13-2-2 (1); *Travelers Ins. Co. v. Blakey*, 255 Ga. 699, 700 (342 SE2d 308) (1986); *Salvatori Corp. v. Rubin*, 159 Ga. App. 369 (283 SE2d 326) (1981); *Crooks v. Crim*, supra; *Cassville-White Assoc. v. Bartow Assoc.*, supra at 561; *Burden v. Thomas*, 104 Ga. App. 300 (121 SE2d 684) (1961). The court seeks to determine the intent of the parties within the terms of the entire agreement.

First, since the agreement was drafted by the Joint Venture it must be construed most strongly against its interests. See OCGA § 13-2-2 (5); *Franklin v. Franklin*, 262 Ga. 218 (1) (416 SE2d 503) (1992) (construed against the drafter of a settlement agreement); *Shiflett v. Anchor Rome Mills, Inc.*, 78 Ga. App. 428, 433 (3) (50 SE2d 853) (1948) (agreement construed most strongly against drafter). Second, where statutory rights are clearly granted, the waiver of such vested rights should not be found in an agreement absent a clear, unambiguous, and conscious intent to surrender such rights. See generally *Bishop v. State*, 241 Ga. App. 517, 521-522 (1) (526

SE2d 917) (1999) (rejection of an implied waiver of privacy rights granted by statute). Neither the letter settlement agreement nor the promissory note contains language that indicates the waiver of the Executor's commissions; to the contrary, the unclear term "net proceeds" to be paid to the Joint Venture indicates that attorney fees and expenses of litigation will be deducted prior to any payment to the Joint Venture; however, the Joint Venture was to advance and pay the litigation expenses. Therefore, the Executor's commissions come within such expenses unpaid prior to payment to satisfy the balance due on the promissory note.

The construction of the agreement is further necessary, because the express language of the promissory note gave only a limited assignment of the net proceeds to secure payment of the balance of the note. The balance of the net proceeds was payable to the Estate and did not make a prohibited general assignment under the terms of the agreement. Third, contracts are to be construed so as to uphold and give effect to the agreement as lawful and not to render portions of the agreement ineffective. See *Bd. of Regents &c. of Ga. v. A. B. & E., Inc.*, 182 Ga. App. 671, 675 (357 SE2d 100) (1987) (construe so that part of contract is not rendered void or meaningless); *Whitmire v. Colwell*, 159 Ga. App. 682, 683 (285 SE2d 28) (1981) (give reasonable, lawful, and effective meaning to all terms). To construe this language as a general assignment risked the language being void ab initio as a prohibited assignment of a personal tort and not an assignment of a property interest.[2] Further, to construe the language as a general assignment also fails to give effect to the terms of the agreement that give the remainder of the net proceeds to the Estate. See footnote 2, supra. When the letter settlement agreement and the

---

[2] Under OCGA § 44-12-24, a personal tort action and an action for fraud are nonassignable nor are the rights to punitive damages assignable. See *Hayslip v. Speed Check Co.*, 214 Ga. 479, 482 (105 SE2d 455) (1958) (action for fraud not assignable); *Southern R. Co. v. Malone Freight Lines*, 174 Ga. App. 405, 408 (1) (330 SE2d 371) (1985) (punitive damages not assignable); *American Chain &c. Co. v. Brunson*, 157 Ga. App. 833, 835-837 (278 SE2d 719) (1981). The issue whether the legal malpractice action against Rolleston was a property action or a personal tort action was avoided by the Joint Venture by having the Estate bring the action. *Harrison v. Beckham*, 238 Ga. App. 199, 200, n. 2 (518 SE2d 435) (1999) (legal malpractice statute of limitation based upon whether action sounds in contract or personal tort); *Plumlee v. Davis*, 221 Ga. App. 848 (473 SE2d 510) (1996) (statute of limitation for legal malpractice depends upon whether the action is based upon an underlying action for property or personal tort). When a contract is between one with a personal tort which cannot be assigned and another who advances litigation expenses and shares with the plaintiff in any recovery, such agreement does not constitute a general assignment which is prohibited in Georgia. *Anderson v. Anderson*, 12 Ga. App. 706 (78 SE 271) (1913). Therefore, any general assignment of the net proceeds of a legal malpractice action sounding in tort, fraud, and seeking punitive damages would be void ab initio; however, if this was a limited assignment only to secure the repayment of the promissory note, then it would not violate the prohibition against assignments of actions of a personal tort.

promissory note are considered, there is nothing in the terms that can be construed as the Executor's express waiver of his rights to commissions from the Estate. Therefore, if the Joint Venture held a security interest by limited assignment of the net proceeds of any recovery against Rolleston as a creditor of the Estate, then it, as a creditor, took subject to the Estate's expenses of Executor's commissions. See OCGA § 53-7-40 (3).

The cardinal rule of construction is the determination of the intent of the parties from the entire agreement. OCGA § 13-2-2 (4); *Paul v. Paul*, 235 Ga. 382, 384 (219 SE2d 736) (1975); *Yargus v. Smith*, 254 Ga. App. 338, 341 (562 SE2d 371) (2002); *Tucker Materials v. Devito Contracting &c.*, 245 Ga. App. 309, 310 (535 SE2d 858) (2000). When all the rules of construction have been applied to determine the intent of the parties, it is apparent from the letter settlement agreement and the promissory note that the Joint Venture had no ability to satisfy the entire judgment against the Estate unless the malpractice action and collection efforts were successfully performed by the Estate over many years of expected litigation; otherwise, it would have taken all the Estate's assets in satisfaction, recognizing the Estate's inability to satisfy the promissory note from other assets. To this end, the Joint Venture let the Estate retain and distribute those assets which were important to the heirs but which were inadequate to substantially satisfy the promissory note. Therefore, the Joint Venture was willing to pay expenses and litigation costs of the Estate, to pay attorney fees of the Estate, to indemnify the Estate, to allow some Estate assets to be distributed to heirs, and even to pay the Executor's commissions to keep him litigating for years on its behalf to recover money to pay down the principal and interest on the promissory note to the Joint Venture. To avoid legal problems, the Joint Venture did not want to take a general assignment of the claims against Rolleston and pursue the claims in its own name as the real party in interest but sought to obtain the efforts of the Estate. Therefore, the Joint Venture had to have the Estate pursue the claims against Rolleston. The Joint Venture's action against the Estate took from 1985 until 1991 with many delays and appeals when Rolleston represented Sims; thus, the Estate and the Joint Venture both fully contemplated protracted litigation against Rolleston from this prior experience. The language used in the settlement agreement and the promissory note indicated this by describing the action against Rolleston, showing this foreknowledge of the probability of actions for fraudulent conveyance. Thus, both the Joint Venture, in assuming the obligation to pay litigation expenses and to indemnify the Estate against counterclaims by Rolleston, and the Executor foresaw protracted litigation difficulties in obtaining and in collecting any judgment. Thus, the Executor never intended to waive

his commissions, and the Joint Venture never intended that he do so in what both knew would be difficult legal battles, because this commission was the only real financial inducement that existed to keep the Executor litigating. Absent the Executor's commissions, Cherry had little incentive to continue to pursue a judgment and a recovery with only a remote possibility of some net proceeds finally coming to the Estate. Looking to the four corners of the written documents, the intent of the parties is clear that normal expenses of collection and distribution of the Estate's assets applied, with the net proceeds of the judgment against Rolleston being an Estate asset. See *Friedman v. Friedman*, 259 Ga. 530, 533 (3) (384 SE2d 641) (1989), overruled on other grounds, *Duckworth v. State*, 268 Ga. 566 (492 SE2d 201) (1997); *Spooner v. Dykes*, 174 Ga. 767 (2) (163 SE 889) (1932).

Finally, the attorney for the Estate and not the Executor executed the letter settlement agreement. Such counsel lacked the real or apparent authority to waive or to surrender the individual's rights to a commission possessed by the Executor and not the Estate. Thus, absent a clear and express waiver of the Executor's rights to a commission in the letter settlement agreement, such agreement cannot be found to have such effect. *Anderson v. Anderson*, 12 Ga. App. 706 (78 SE 271) (1913).

The application of the rules of construction requires a finding that there was no waiver of the Executor's commissions; that he was entitled to collect them prior to any payment of net proceeds to the Joint Venture; that the net proceeds of any recovery of the judgment against Rolleston remained an asset of the Estate, with sufficient sums limitedly assigned as security for payment to satisfy the promissory note and with a priority of payment of this debt; and that the balance of the net proceeds remaining after payment of the balance and interest on the promissory note was an asset of the Estate. The probate court erred in granting summary judgment to the Joint Venture and in denying it to the Executor for the Estate.

2. The remaining issues raised on appeal are controlled by our holding in Division 1.

*Judgment reversed. Johnson, P. J., and Mikell, J., concur.*

DECIDED FEBRUARY 20, 2003.

*Winburn, Lewis, Barrow & Stolz, Irwin W. Stolz, Jr., Shelby A. Outlaw*, for appellant.

*Kidd & Vaughan, Woodrow W. Vaughan, Jr., James D. Blitch IV*, for appellee.